## NATIONAL LABOR RELATIONS BOARD v. MACKAY RADIO & TELEGRAPH CO.

### No. 8137.

Circuit Court of Appeals, Ninth Circuit.
Jan. 11, 1937.

GARRECHT, Circuit Judge, dissenting.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Thomas I. Emerson and Stanley S. Surrey, Attorneys, National Labor Relations Board, all of Washington, D. C., and Bertram Edises, Atty., National Labor Relations Board, of San Francisco, Cal., for petitioner.

Louis W. Myers and Homer I. Mitchell, both of Los Angeles, Cal., and J. Harold Merrick, of New York City, (O'Melveny, Tuller & Myers of Los Angeles, Cal., of counsel), for respondent.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

The National Labor Relations Board has petitioned this court for an order of enforcement in accordance with the provisions of section 10, subdivision (e), of the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. § 151 et seq., § 160(e) approved July 5, 1935. The order of the Board was made after an extensive hearing, and at the conclusion of a lengthy opinion rendered upon the complaint of the American Radio Telegraphists' Association, San Francisco Local No. 3, on behalf of five employees of the respondent who were not re-employed by the respondent after the termination of a strike in which four of the five employees actively participated as members of that association. The order requires the respondent to cease and desist from discharging or threatening to discharge employees who have joined that union or have engaged in union activities, and from interfering with the rights of self organization and collective bargaining "as guaranteed by section 7 of the National Labor Relations Act [29 U.S.C.A. § 157]," and to offer the five former employees "immediate and full reinstatement * * * without prejudice to any rights previously enjoyed," and to pay them full compensation for the period of unemployment, less the amount earned subsequent to discharge, and to post notices for thirty days that it will not discharge members of that association or others desiring to join or assist it or other union activities. The full text of the order is set out in footnote No. 1.

---

1 "On the basis of the findings of fact and conclusions of law and pursuant to section 10, subdivision (c) of the National Labor Relations Act [29 U.S.C.A. § 160 (c)], the National Labor Relations Board hereby orders that the respondent, Mackay Radio and Telegraph Company, and its officers and agents, shall:

"1. Cease and desist (a) from discharging or threatening to discharge any of its employees for the reason that such employees have joined or assisted American Radio Telegraphists' Association, San Francisco Local No. 3, or otherwise engaged in union activity, and (b) from in any manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in section 7 of the National Labor Relations Act [29 U.S.C.A. § 157].

"2. To take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Offer to A. B. Loudermilk, L. K. Bash, P. D. Phelps, L. N. Rone, and G. E. Palmer immediate and full reinstatement, respectively, to their former positions, without prejudice to any rights and privileges previously enjoyed:

"(b) Make whole said A. B. Loudermilk, L. K. Bash, P. D. Phelps, L. N. Rone, and G. E. Palmer for any loss of pay they have suffered by reason of their discharge by payment, respectively, of a sum of money equal to that which each would normally have earned as wages during the period from the date of his discharge to the date of such offer of reinstatement, computed at the wage rate stated in the findings of fact as the rate each was paid at the time of his discharge, less the amount earned subsequent to discharge as shown in the findings of fact;

"(c) Post immediately notices to its employees in conspicuous places in its various offices, including those located in San Francisco and elsewhere, stating (1) that the respondent will not discharge or in any manner discriminate against members of, or those desiring to become members of, the American Radio Telegraphists' Association, or persons assisting said organization or otherwise engaging in union activity, and (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting; and it is further ordered,

"(3) That the complaint be, and it hereby is, dismissed without prejudice with respect to the allegations of Paragraphs 8,

The respondent appears and attacks the constitutionality of the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. § 151 et seq., approved July 5, 1935), hereinafter referred to as "the Act," and the validity of the proposed order in pursuance thereof.

At the time of the argument the Supreme Court had under advisement a case arising under the Bituminous Coal Conservation Act (15 U.S.C.A. §§ 801–827, 49 Stat. c. 824, p. 991), otherwise known as the Guffey Act, a decision in which it was thought might be decisive in this matter. Accordingly it was arranged that supplemental briefs might be filed by the parties within 60 days after the decision in that case. The decision therein was rendered May 18, 1936. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160. The act there in question dealt with the mining of bituminous coal. It was held that such production of coal was not interstate commerce, and, consequently, it was held that the attempt of Congress to regulate that industry was not within the power delegated to the federal government by the commerce clause of the Constitution (article 1, § 8, cl. 3). Upon the authority of that decision the Circuit Court of Appeals for the Fifth Circuit held the National Labor Relations Act void in so far as it attempts to regulate the production of steel. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 83 F. (2d) 998, decided June 15, 1936.

In the case at bar it is conceded that the respondent was engaged in interstate commerce, and that each of the five employees ordered restored to their positions was so engaged.

The respondent contends that the entire act must be held invalid if the general provisions thereof relating to such intrastate activities as mining and manufacturing are beyond the regulatory power of Congress, because, if the all-inclusive character of the act is destroyed, the purpose of Congress is frustrated. It is pointed out that the Supreme Court in January, 1908, in the cases of Howard v. Illinois Central Railroad Co. (Brooks v. Southern Pacific Co.), 207 U.S. 463, 28 S.Ct. 141, 146, 52 L.Ed. 297, declined the task of segregating the interstate commerce features from the intrastate features of an Act of Congress of June 11, 1906, dealing with employers' liability (34 Stat. 232), for the purpose of limiting the act to interstate commerce. The act, however, presented a peculiar difficulty in that it purported to deal specifically with the District of Columbia and with the territories of the United States over which the Congress of the United States has plenary legislative authority. To write into that act a restriction confining it to those employees engaged in interstate commerce the court thought would be to negative the expressed will of Congress as to the District of Columbia and the territories. Justice White, speaking for the majority of the court, said: "To write into the act the qualifying words, therefore, would be but adding to its provisions in order to save it in one aspect [as to interstate commerce], and thereby to destroy it in another [as to the District of Columbia and as to the territories]; that is, to destroy in order to save, and to save in order to destroy." The decision of the majority of the Supreme Court is, of course, controlling, but it should be noted that the minority of four members maintained that the constitutional and unconstitutional features of the act could be separated and the former enforced by holding the act in question applicable only to interstate commerce and to those engaged in it. The difficulty which confronted the Supreme Court in the Howard Case, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297, supra, dealing with the Employers' Liability Act of June 1906, is not so pronounced in dealing with the National Labor Relations Act because in the Labor Relations Act Congress has expressly predicated that legislation upon its power to regulate interstate commerce. It has defined commerce in section 2, subdivision 6 (29 U.S.C.A. § 152 (6), as interstate commerce.[2] The term "affecting commerce"

---

9, and 10 thereof and so much of the allegation of Paragraph 12 as depends upon the aforesaid allegations.

"Signed at Washington, D. C., this 20th day of February, 1936.

"J. Warren Madden, Chairman,

"John M. Carmody, Member.

"Edwin S. Smith, Member.

"National Labor Relations Board.

"[Seal]"

[2] "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but

is also described as applying to acts which "burden" or "obstruct" the free flow of "commerce." Section 2, subdivision 7 of the act (29 U.S.C.A. § 152(7)).[3]

In view of the definition of commerce contained in the act, and the use of the familiar expressions relating thereto "burdening," "obstructing," the "free flow of commerce," the act by its terms is expressly confined to the regulation of interstate commerce. Any attempt to apply the act to activities other than interstate commerce and to matters which only indirectly affect such commerce is not authorized by the terms of the act if properly construed. There is, therefore, no difficulty to be encountered by the courts in limiting the act to matters within the commerce clause of the Constitution, for Congress has already done so. If the officials of the government in executing this statute have attempted to extend it to matters wholly intrastate in character, they have done so in the teeth of the statute and the federal Constitution. Moreover, Congress has expressly provided that the invalidity of a portion of the act shall not affect its application of the act to others coming within the constitutional power of Congress (section 15 of the act (29 U.S.C.A. 165),[4] and this provision of the act requires the court to apply the act to interstate commerce unless it can be clearly seen that such application would frustrate the real object and intent of Congress in passing the act.

In a recent decision by the Circuit Court of Appeals for the Fifth Circuit it was held that the act was not totally void, although some of the provisions might be held unconstitutional. Bradley Lumber Co. of Arkansas v. National Labor Relations Board, 84 F.(2d) 97, decided June 5, 1936. See also, Dorchy v. Kansas, 264 U.S. 286, 290, 44 S.Ct. 323, 324, 68 L.Ed. 686; Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038; Railroad Retirement Board v. Alton R. Co., 295 U. S. 330, 55 S.Ct. 758, 79 L.Ed. 1468; Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 873, 80 L.Ed. 1160, dissent of Chief Justice Hughes, 56 S.Ct. 877, dissent of Justice Cardozo, 56 S.Ct. 883.

In so far as the act purports to regulate interstate commerce, Congress was acting within its constitutional grant of power over commerce, and the act is thus applicable to the interstate business of the respondent in which the five employees were engaged.

It remains to consider the constitutional limitations upon the power of Congress to regulate commerce contained in the bill of rights (Const. Amendments 1 to 10), by which the people of the United States sought to protect individual and personal rights from legislative encroachment by prohibiting Congress and the national government from enacting or enforcing laws derogatory thereto. The respondent invokes articles 5 and 7 of these constitutional amendments and claims that it would be deprived of liberty and property within the meaning of article 5 and of a jury trial as to damages in violation of article 7 if the order of the Board were enforced.

These fundamental rights of man were recognized by the Declaration of Independence as inherent in him. It was therein declared that governments were instituted to secure these rights.[5]

The Fifth Amendment to the Constitution provides for the protection of certain of these inalienable rights by providing that "no person shall be * * * deprived of life, liberty, or property, without due process of law" by the federal government.

---

through any other State or any Territory or the District of Columbia or any foreign country."

3 "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

4 "Sec. 15. If any provision of this Act [chapter], or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Act [chapter], or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby."

5 "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."

The respondent contends that one of the liberties announced by the Declaration of Independence as a self-evident right, and thus guaranteed by the Federal Constitution, is the right of men to freely enter into contracts. Respondent contends that this right to freely contract with its employees is taken away without due process of law by the order which requires it to offer to enter into a contract of employment with persons and upon terms fixed by the National Labor Relations Board and not of its own choosing, and also contends that the contemplated order in effect requires it to discharge five employees with whom it has entered into a binding contract to retain in its employment and which it desires to retain and to substitute five persons it does not desire to employ. It also contends that by the order requiring it to pay wages to these persons for the period during which they have been out of employment is in effect to assess damages against it without a jury trial in violation of the Seventh Amendment to the Constitution.

From the earliest times it has been held that the word "liberty" as used in the Fifth Amendment to the Constitution and in the Declaration of Independence included the right to freely contract, and that to deprive an individual of that right without due process of law was to deprive him of liberty in violation of the Constitution. This matter was considered by the Supreme Court in 1907 in Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 279, 52 L.Ed. 436, 13 Ann.Cas. 764, decided January 1908, where it had under consideration the constitutionality of an Act of Congress passed June 1, 1898 (30 Stat. 424, c. 370). This act provided a plan for the arbitration of labor disputes occurring in the business of interstate commerce and transportation. A prior act on the same subject, passed October 1, 1888 (25 Stat. 501), was repealed by the later act. The tenth section of the Act of June 1, 1898, prohibited employers from requiring as a condition of such employment that the employee enter into an agreement, either written or verbal, not to become or remain a member of a labor corporation, association or organization, and prohibited the employer from threatening any employee with loss of employment or to discriminate against an employee because of his membership in such a labor organization. A violation of this portion of the act was made a crime against the United States, and Adair, the appellant, who was an agent and employee of a common carrier, was convicted of a violation of this portion of the act by discharging an employee because of his membership in a labor organization. The Supreme Court held that the act of Congress making such discharge a crime was unconstitutional because it violated the fundamental right of the employer to terminate its contract with its employees. The question propounded and answered by the court in that case was as follows: "May Congress make it a criminal offense against the United States—as, by the 10th section of the act of 1898, it does—for an agent or officer of an interstate carrier, having full authority in the premises from the carrier, to discharge an employee from service simply because of his membership in a labor organization?"

The court answered this question in the negative because it held that such an act infringed the liberty of the common carrier and its agents to enter into and terminate its contracts. The petitioner seems to concede that this decision and a subsequent decision of the Supreme Court on the same subject (Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960, decided January 25, 1915) control unless they are overruled or modified by the later decision of the Supreme Court rendered May 26, 1930, in Texas & New Orleans Ry. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L. Ed. 1034. I quote from the petitioner's brief in that regard in footnote No. 6.

In view of the position of the petitioner

6 "Respondent in this case—as did respondent in the Texas & New Orleans Case—will undoubtedly attempt to rely upon the Adair and Coppage Cases. In these cases the court held invalid on grounds of due process, legislation making it a criminal offense, respectively, to discharge employees because of membership in a labor organization and to require as a condition of employment that employees refrain from such membership.

"These cases were decided in 1908 and 1915 by sharply divided courts. Both decisions were vigorously urged before the Supreme Court in the Texas & New Orleans Case. The unanimous court in the Texas & New Orleans Case expressly holds them inapplicable to the situation before the court there, and here.

"It is unnecessary to make an extended analysis of the Adair and Coppage Cases or to consider whether or not they

with reference to these two decisions of the Supreme Court and the respondent's reliance thereon, it is important to consider the basis of these decisions. Justice Harlan, speaking for the court in Adair v. United States, supra, said: "The first inquiry is whether the part of the 10th section of the act of 1898 upon which the first count of the indictment was based is repugnant to the 5th Amendment of the Constitution, declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that Amendment. Such liberty and right embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject-matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests, or as hurtful to the public order, or as detrimental to the common good."

The court, speaking through Justice Harlan, quoted with approval from Cooley on Torts, p. 278, as follows: "Mr. Cooley, in his treatise on Torts, p. 278, well says: 'It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with anyone with whom he can make contracts, and, if he is wrongfully deprived of this right by others, he is entitled to redress.' "

Justice Harlan also quoted with approval from the decision of the court in Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133, as follows: " 'The general right to make a contract in relation to his business is part of the liberty of the individual protected by the 14th Amendment of the Federal Constitution. Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. Under that provision no state can deprive any person of life, liberty, or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this Amendment, unless there are circumstances which exclude the right.' "

After quoting from Lochner v. New York, supra, he proceeded as follows:

"Although there was a difference of opinion in that case among the members of the court as to certain propositions, there was no disagreement as to the general proposition that there is a liberty of contract which cannot be unreasonably interfered with by legislation. * * *

"While, as already suggested, the right of liberty and property guaranteed by the Constitution against deprivation without due process of law is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least, in the absence of contract between the parties—*to compel any person, in the course of his business and against his will, to accept or retain the personal services of*

---

were in effect overruled by the Texas & New Orleans Case. If they were inapplicable in the Texas & New Orleans Case they are inapplicable here, for the facts of the two cases are at all points parallel.

"In the Texas & New Orleans Case the District Court, using practically the language of the statute in its decree, enjoined the Railroad from violating the statute. In punishing the Railroad for contempt arising out of its violation of the injunction the court gave specific content to the general language of the statute. It held that discharging some of the employees, and discriminating against others, because of their union activities, and the fostering of the Employees Association, were violations of the injunction. This meant that these acts of the Railroad were violations of the statute, since the injunction was based upon the statute and followed its language.

"The Texas & New Orleans Case held that the discharge of employees for union activity was not the 'normal exercise of the right' to hire and fire employees which is protected under the due process clause. It should be noted further, however, that the reasoning of Chief Justice Hughes followed closely that of the dissenting opinions in the Adair and Coppage Cases.

"This is perfectly clear from the fact that the amended bill of complaint, upon the basis of which the District Court entered the permanent injunction, incorporated most of the matter alleged and proved in the contempt proceedings. The facts thus alleged were squarely before the Supreme Court for decision, and it so regarded them."

*another, or to compel any person, against his will, to perform personal services for another.* The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. *So the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee.* It was the legal right of the defendant, Adair,—however unwise such a course might have been,—to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so,—however unwise such a course on his part might have been,—to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. *In all such particulars the employer and the employee have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land.* * . * *

"As the relations and the conduct of the parties towards each other was not controlled by any contract other than a general employment on one side to accept the services of the employee and a general agreement on the other side to render services to the employer,—no term being fixed for the continuance of the employment,— *Congress could not, consistently with the 5th Amendment, make it a crime against the United States to discharge the employee because of his being a member of a labor organization.*" (Italics ours.)

The court then proceeded to consider the argument that, notwithstanding the Fifth Amendment and its apparent violation, Congress, in pursuance of its authority to regulate interstate commerce, had a right to thus limit the liberty of contract. In answer to this proposition advanced by the government the Supreme Court held that such legislation *was not a regulation of interstate commerce.* In view of the importance of the question in the case at bar, I further quote from that decision as follows:

"Looking alone at the words of the statute for the purpose of ascertaining its scope and effect, and of determining its validity, we hold that there is no such connection between interstate commerce and membership in a labor organization *as to authorize Congress to make it a crime against the United States for an agent of an interstate carrier to discharge an employee because of such membership on his part.* If such a power exists in Congress it is difficult to perceive why it might not, by absolute regulation, require interstate carriers, under penalties, to employ, in the conduct of its interstate business, only members of labor organizations, or only those who are not members of such organizations,—*a power which could not be recognized as existing under the Constitution of the United States.* No such rule of criminal liability as that to which we have referred can be regarded as, in any just sense, a regulation of interstate commerce. *We need scarcely repeat what this court has more than once said, that the power to regulate interstate commerce, great and paramount as that power is, cannot be exerted in violation of any fundamental right* secured by other provisions of the Constitution. Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23, 70; Lottery Case (Champion v. Ames), 188 U.S. 321, 353, 23 S.Ct. 321, 47 L.Ed. 492, 500.

"It results, on the whole case, that the provision of the statute under which the defendant was convicted must be held to be repugnant to the 5th Amendment, and as not embraced by nor within the power of Congress to regulate interstate commerce, but, under the guise of regulating interstate commerce, and as applied to this case, it arbitrarily sanctions an illegal invasion of the personal liberty as well as the right of property of the defendant, Adair." (Italics ours.)

In 1914 in Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 243, 59 L.Ed. 441, L.R.A. 1915C, 960, supra, the Supreme Court had under consideration the right of a state to make it a crime to require an applicant for employment to agree as a condition of employment not to join or become or remain a member of a labor organization. The only restriction upon the power of the state was that contained in the Fourteenth Amendment to the Constitution of the United States which declares that no state shall deprive any person of liberty or property without due process of law, thus placing a limitation upon the states' power of legislation similar to that embodied in the Fifth Amendment affecting the power of the United States. The Supreme Court

held that the facts could not be distinguished in principle from its decision in Adair v. United States, supra, and not only declined to overrule that case, but also again reaffirmed the constitutional right of freedom to contract and reaffirmed the invalidity of a statute, whether state or national, violating that right. The court in its decision propounded ten questions relating to the right to require an employee to forego his constitutional right to belong to a labor organization, and gave its answers thereto. I quote the last question and answer, as follows:

"Can the right of making contracts be enjoyed at all, except by parties coming together in an agreement that requires each party to forego, during the time and for the purpose covered by the agreement, any inconsistent exercise of his constitutional rights?

"These queries answer themselves. The answers, as we think, lead to a single conclusion: Under constitutional freedom of contract, whatever either party has the right to treat as sufficient ground for terminating the employment, where there is no stipulation on the subject, he has the right to provide against by insisting that a stipulation respecting it shall be a sine qua non of the inception of the employment, or of its continuance if it be terminable at will. It follows that this case cannot be distinguished from Adair v. United States.

"The decision in that case was reached as the result of elaborate argument and full consideration. The opinion states (208 U.S. [161] 171 [28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764]): 'This question is admittedly one of importance, and has been examined with care and deliberation. And the court has reached a conclusion which, in its judgment, is consistent with both the words and spirit of the Constitution, and is sustained as well by sound reason.' We are now asked, in effect, to overrule it; and in view of the importance of the issue we have reexamined the question from the standpoint of both reason and authority. As a result, we are constrained to reaffirm the doctrine there applied."

The court, however, ex industria, stated that it is not dealing with a question of coercion of employees or other undue influence exercised against their right to belong to a labor organization. The court also stated: "The decision in the Adair Case is in accord with the almost unbroken current of authorities in the state courts." Justice Holmes, who dissented, contended that the decision in Adair v. United States, supra, and in Lochner v. New York, supra, should be overruled. However, Justice Day, who also dissented, declared: "That the right of contract is a part of individual freedom within the protection of this Amendment [14th], and may not be arbitrarily interfered with, is conceded."

These two comparatively recent decisions of the Supreme Court (Adair v. United States, and Coppage v. Kansas) expressly reaffirm the long-established principle that the right to contract upon terms mutually agreed upon is an inherent right of a human being expressly protected against infringement by the United States by the Fifth Amendment and by the states by the Fourteenth Amendment to the Constitution. In these two decisions it is fully recognized that the right to contract is not so absolute that it cannot be interfered with by the government, and that the ultimate question for the court in passing upon the validity of statutes which it is claimed have infringed upon or interfered with the right of contract is to determine whether or not the statute is an arbitrary or unreasonable interference with such right. It is clear, in the case at bar, that we are asked to enforce an order of the National Labor·Relations Board which definitely requires the respondent to make a certain contract against its will and upon terms fixed by the Board. That this is an infringement of the respondent's liberty to contract on terms of its own choosing, and, consequently, of the guaranteed "liberty" of the respondent, is entirely clear. It is equally clear that the principles announced by the Supreme Court in Adair v. United States, and Coppage v. Kansas, supra, as to the constitutional limitation placed upon the power of Congress by the Fifth Amendment, would prohibit the enforcement of such an order by the court, notwithstanding the fact that the order may have been made in strict accordance with the provisions of an act of Congress.

Here it should be stated that I have not overlooked the fact that in the Adair Case the court recognized that there might be a distinction between the rights of Adair, an employee, to discharge a subordinate and the right of the common carrier to do so.

As it is claimed that the decision of the Supreme Court in the case of Texas & N.

O. R. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 434, 74 L.Ed. 1034, supra, either overruled or so far modified these prior decisions that they are no longer authoritative upon the questions involved in this proceeding, it is important to consider that case.

The case arose under the Railway Labor Act of 1926, § 2, subd. 3 (44 Stat. 577), see 45 U.S.C.A. § 152, subd. 3. The court there said: "The petitioners invoke the principle declared in Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L. Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960, but these decisions are inapplicable. The Railway Labor Act of 1926 does not interfere with the normal exercise of the right of *the carrier to select its employees or to discharge them. The statute is not aimed at this right of the employers but at the interference with the right of employees to have representatives of their own choosing. As the carriers subject to the act have no constitutional right to interfere with the freedom of the employees in making their selections, they cannot complain of the statute on constitutional grounds.*"

This brief reference to the case of Adair v. United States, and Coppage v. United States, makes it entirely clear that the court had no intention to depart from the principles involved in those cases, instead they are recognized but held inapplicable. It is therefore important to consider why such principles were inapplicable to that case with a view to ascertaining whether or not there was any intention to modify the previous decisions. As stated, the question under consideration was the validity and effect of the Railway Labor Act of 1926. This act provided for a voluntary system of arbitration of labor disputes between employers and employees engaged in interstate commerce. In order to facilitate such arbitration, the act set up a board known as the United States Board of Mediation. Controversies were to be submitted to that Board by and in pursuance of a voluntary agreement entered into between the Railroad Company and its employees. The decision of the Board of Mediation was to be entered in the District Court as a final and binding award subject to contest before the District Court if either party so desired.

As an incident to this right to arbitrate the statute provided: "Representatives, for the purposes of this Act, shall be designated by the respective parties in such manner as may be provided in their corporate organization or unincorporated association, or by other means of collective action, *without interference, influence, or coercion exercised by either party over the self-organization or* designation of representatives by the other." 44 Stat. 577, § 2, subd. 3.

The Brotherhood of Ry. & S. S. Clerks brought an action in equity to enjoin the employers from interfering with their right to select representatives for the purposes of the act; that is, representatives to negotiate an arbitration agreement. The trial court granted a temporary injunction prohibiting the carrier from "in any way or manner interfering with, influencing, intimidating, or coercing plaintiffs or any of its employees with respect to their free and untrammeled right of selecting or selecting or designating their representatives for the purpose of considering and deciding any and all disputes between said clerical employees and the defendant Railroad Company and from interfering with their free and untrammeled right of self organization."

It was claimed that the company had violated the injunction by recognizing the association of clerical employees of the Southern Pacific lines as the representative of the clerical employees of the company. Proceedings were brought to punish the Railroad Company and certain of its officers for contempt. The court adjudged them to be in contempt and directed that in order to purge themselves of the contempt the Railroad Company should disestablish the association of clerical employees, reinstate the Brotherhood as the representative of labor, and restore to service and to stated privileges its employees who had been discharged by the Railroad Company. The temporary injunction was made permanent, and a motion in the lower court to vacate the order and contempt proceedings was denied. Brotherhood of Ry. & S. S. Clerks, etc., v. Texas & N. O. R. Co. (D. C.) 25 F. (2d) 873; Id. (D.C.) 25 F.(2d) 876. An appeal was taken from the adjudication of contempt and also from the final decree making the injunction permanent. The Circuit Court of Appeals (33 F.(2d) 13) affirmed the decree for permanent injunction and sustained the order of the trial court fixing the terms under which the Railroad Company could purge itself of

contempt as an "appropriate exercise of its authority in providing for the restoration of the status quo." 281 U.S. 548, 50 S.Ct. 427, 429, 74 L.Ed. 1034.

The Supreme Court quoted the third paragraph of section 2 of the Railway Labor Act, supra, and stated, "The controversy is with respect to the construction, validity, and application of this statutory provision." The Railroad Company contended " * * * that, in so far as the statute undertakes to prevent either party from influencing the other in the selection of representatives, it is unconstitutional because it seeks to take away an inherent and inalienable right in violation of the First and Fifth Amendments of the Federal Constitution."

It will thus be observed that the contention of the Railroad Company was that it had an inherent and constitutional right to interfere with the selection of the representatives of its employees who were to bargain with it with reference to the arbitration of differences. The District Court and the Circuit Court of Appeals held that there was actual coercion of the employees in regard to the selection of their representatives and the Supreme Court declined to review those findings. Thus the question considered by the Supreme Court was whether the Railroad Company, had a right to coerce its employees in the selection of their agents to represent them in this proposed settlement of disputes with the Railroad Company. It will be observed that this question of coercion was one which was expressly excluded from the decision of the Supreme Court in Coppage v. Kansas, supra, it being assumed in the majority opinion that coercion with reference to membership in a labor organization might be a proper subject for governmental control. In this view it is clear that the earlier cases did not bear directly upon the question considered by the Supreme Court in Texas & N. O. Railroad Case. In the latter case it was held that the statute gave a right to the employees upon which they could seek the intervention of the court to enjoin the Railroad Company from an interference with that right. In considering the question Chief Justice Hughes, speaking for the court, said:

"While adhering in the new statute to the policy of providing for the amicable adjustment of labor disputes, and for voluntary submissions to arbitration as opposed to a system of compulsory arbitration, Congress buttressed this policy by creating certain definite legal obligations. The outstanding feature of the Act of 1926 is the provision for an enforceable award in arbitration proceedings. The arbitration is voluntary, but the award pursuant to the arbitration is conclusive upon the parties as to the merits and facts of the controversy submitted. Section 9 (45 U.S.C.A. § 159). The award is to be filed in the clerk's office of the District Court of the United States designated in the agreement to arbitrate, and unless a petition to impeach the award is filed within ten days, the court is to enter judgment on the award, and this judgment is final and conclusive. Petition for the impeachment of the award may be made upon the grounds that the award does not conform to the substantive requirements of the act or to the stipulation of the parties, or that the proceedings were not in accordance with the act or were tainted with fraud or corruption. But the court is not to entertain such a petition on the ground that the award is invalid for uncertainty, and in such case the remedy is to be found in a submission of the award to a reconvened board or to a subcommittee thereof for interpretation, as provided in the act. Thus it is contemplated that the proceedings for the amicable adjustment of disputes will have an appropriate termination in a binding adjudication, enforceable as such. * * *

"It is thus apparent that Congress, in the legislation of 1926, while elaborating a plan for amicable adjustments and voluntary arbitration of disputes between common carriers and their employees, thought it necessary to impose, and did impose, certain definite obligations enforceable by judicial proceedings. The question before us is whether a legal obligation of this sort is also to be found in the provisions of subdivision third of section 2 of the act (45 U.S.C.A. § 152, subd. Third) providing that, 'Representatives, for the purposes of this Act, shall be designated by the respective parties * * * without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other.' * * *

"In reaching a conclusion as to the intent of Congress, the importance of the prohibition *in its relation to the plan devised by the act must have appropriate consideration*. Freedom of choice in the selection of representatives on each side of the

dispute is the essential foundation of the statutory scheme. All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained. There is no impairment of the voluntary character of arrangements for the adjustment of disputes in the imposition of a legal obligation not to interfere with the free choice of those who are to make such adjustments. On the contrary, it is of the essence of a voluntary scheme, if it is to accomplish its purpose, that this liberty should be safeguarded. The definite prohibition which Congress inserted in the act can not therefore be overridden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated. * * *

"We entertain no doubt of the constitutional authority of Congress to enact the prohibition. The power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238); to 'foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A. [N.S.] 44). Exercising this authority, Congress may facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation. In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures. The legality of collective action on the part of employees in order to safeguard their proper interests is not to be disputed. It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. * * * Thus the prohibition by Congress of interference with the selection of repre-

sentatives for the purpose of negotiation and conference between employers and employees, instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both."

It is thus apparent that the Supreme Court had under consideration in Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, supra, the single question of whether or not Congress in setting up a scheme for voluntary arbitration of railway labor disputes could prohibit interference by the one party, the Railroad Company, with the rights of the other parties, the employees to select those who were to represent them in the proposed arbitration, or it might be put thus, Were the representatives selected by the employees for bargaining with the employer as to the proposed arbitration to be acceptable to the employer or to the employees? It is clear, as the court stated, that the principles announced in Adair v. United States, have no relevancy to this question. It is equally clear that Texas & N. O. R. Co. v. Brotherhood, etc., supra, does not modify nor overrule the earlier cases. In this regard it should be stated that some confusion arises in a consideration of this decision from the fact that the trial judge, in his adjudication of contempt in the Texas & New Orleans R. R. Case, required the Railroad Company to restore certain employees who had been discharged in violation of the injunction. This inherent power of the court to enforce its injunctive orders has nothing to do with the power of Congress to regulate or interfere with the right of contract. It is not altogether clear that the Supreme Court had before it the question of the validity of the order adjudging the Railroad Company guilty of contempt. In any event, the decision on that question is irrelevant to the issue in the case at bar.

What the petitioner seeks in this case is the approval and the enforcement of an order which clearly violates the fundamental right of the respondent guaranteed to it by the Fifth Amendment to the Constitution. If we act upon the principles of constitutional law relating to the liberty to contract as announced by the Supreme Court in Adair v. United States, supra, and Coppage v. Kansas, supra, our inquiry would end here, for it was there held that an employer had a right to refuse to contract with a present or prospective mem-

ber of a labor organization, if he so desired, and that an act of Congress, in one case, and a statute of a state, in the other, which prohibited that exercise of discretion, or choice, on the part of the employer, was unconstitutional and void because a violation of the Fifth Amendment. Those decisions we have shown are still authoritative and therefore binding on this court. If these decisions are to be modified, such modification must be made by the Supreme Court itself. However, the scope of the argument, the vast importance of the subject, the different circumstances under which the constitutional guarantee is invoked, and the presumption in favor of the validity of an act of Congress, all warrant, if they do not require, further consideration and discussion of the subject by this court.

The questions presented by the proceeding before us may be stated thus: Assuming that Congress is dealing with interstate commerce, is the act in question a regulation of such commerce? If it is a regulation of interstate commerce and thus within the power delegated to the federal government by the people of the states (U.S.Const. art. 1, § 8, cl. 3), is that power limited by the inhibitions of Amendment 5, or is the regulation of or restriction of the right or liberty to contract guaranteed by the Fifth Amendment so reasonable and necessary in the public interest as to override the private right thus guaranteed in the interest of the people as a whole?

The two questions are distinct, for the grant of power to the federal government over interstate commerce is limited by the terms of the grant itself to the regulation of such commerce (Const. art. 1, § 8, cl. 3), and a further limitation is imposed by the Fifth Amendment. It has been expressly held by the Supreme Court that the commerce clause of the Constitution is limited by the restriction of federal power in Amendment 5. Adair v. United States, supra; Nebbia v. People of State of N. Y., 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469. The basis of the inquiry, so far as the Fifth Amendment is concerned, has been stated by the Supreme Court, speaking through Justice Roberts, in Nebbia v. People of State of N. Y., supra, 291 U.S. 502, at page 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469, as recently as March 5, 1934, as follows:

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts.

"The reports of our decisions abound with cases in which the citizen, individual or corporate, has vainly invoked the Fourteenth Amendment in resistance to necessary and appropriate exertion of the police power."

In order to consider these questions as presented by the facts in this case and the argument thereon by the parties, it is essential that the terms of the National Labor Relations Act (29 U.S.C.A. § 151 et seq.), and the facts to which it is sought to be applied, be further stated.

The act purports to confirm and protect the right of collective bargaining because of the strikes, industrial strife, and unrest resulting from a denial by employers of that right, and the resultant effect on interstate commerce. The act declares these results to be the burdening and obstructing of commerce by impairing the efficiency, safety, or operation of the instrumentalities of commerce, by affecting the flow of raw or manufactured products in commerce or the prices thereof, or by causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce. It is declared that inequality of bargaining power affects the flow of commerce and tends to aggravate recurrent business depressions by depressing wages and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries (section 1 [29 U.S. C.A. § 151]). Congress declares it to be

the policy of the United States to encourage "the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

One of the avowed purposes of the act is, then, to regulate interstate commerce by regulation of the method of entering into labor contracts between employers and employees engaged in interstate commerce. The method of effecting this avowed purpose is to provide a system for the selection of labor representatives (section 9 [29 U.S.C.A. § 159]) ; to declare that such representatives so selected "shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to pay, wages, hours of employment, or other conditions of employment" (section 9) ; and to require the employer to deal with such representatives and them only. It is declared to be an unfair labor practice for the employer "To refuse to bargain collectively with the representatives of his employees." (Section 8, subd. (5), 29 U.S.C.A. § 158 (5). The employer must not interfere in any manner with any labor organization or association or any member thereof. It is declared an unfair labor practice "By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," except that the employer can agree with the representatives of its employees to employ members of that organization only (section 8, subd. (3), 29 U.S.C.A. § 158 (3).

A National Labor Board is set up to prevent unfair labor practices. As defined in section 8, it is empowered " * * * to prevent any person from engaging in any unfair labor practice affecting commerce." This power is declared to be exclusive and not to be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise (section 10(a), 29 U.S.C.A. § 160(a). The unfair labor practices denounced by the act all relate to interference of the employer with the labor union affiliations of its employees, present or prospective, or to his refusal to bargain with such representatives (section 8).

The act deals with the method of selecting the representatives of the employees for collective bargaining. The selection is to be by a majority "in a unit appropriate for such purpose." The Board set up by the act is to decide whether "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

The act provides for investigations, hearings, and orders by the Board concerning unfair labor practices, and for the issuance of an order requiring the employer "to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [chapter]" (section 10(c), '29 U.S.C.A. § 160(c), and to submit its order to the Circuit Court of Appeals for appropriate action (sections 10(e), 9(d), 29 U.S.C.A. §§ 160(e), 159(d) or, in vacation, to the District Court (section 10(e). The court is to enter a decree based upon the record certified to it by the Board, enforcing or modifying, and enforcing as so modified, or setting aside in whole or in part, the order of the Board. It is provided that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive" (section 10 (e), and that "no objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The act also provides for a similar review on petition of the aggrieved party (section 10(f), 29 U.S.C.A. § 160(f). Such petitions are to be heard expeditiously and, if possible, within ten days after they are docketed (section 10(i), 29 U.S.C.A. § 160 (i).

It is made a crime, punishable by fine and imprisonment, to interfere with the Board or its agencies in the performance of their duties (section 12 [29 U.S.C.A. § 162]). It is declared that the act shall not be construed so as to interfere with the right to strike (section 13 [29 U.S.C.A. § 163]). The avowed and evident purpose of the act is to protect labor union organizations and the members thereof, and to assure to them the right to bargain with their employers in their collective

capacity. It is argued on behalf of the petitioner that, as the right to bargain collectively is a well-recognized right, Congress can protect that right. That is true, but in so doing Congress is at the threshold of private and personal rights with which its power to interfere is limited by the Constitution. In that field the right of the individual is superior to the power of Congress, save in exceptional cases. The right of Congress begins only where these inherent and inalienable rights of the individual end. The right to bargain collectively in its essence is the right of a group of persons to select its own agents—an inherent right. When the form of legislation prohibits an individual worker from bargaining for the terms of his own employment, or from selecting his own agent for that purpose, the act destroys instead of protects the right upon which collective bargaining is recognized and sustained; that is, the right to contract by and through any chosen agent, or without any agent at all. The act, by prohibiting the employer from negotiating with any individual or group of employees other than the selected representatives of a group or unit designated by the Board, in effect destroys the right of the minority of that unit and of all other units involved in the bargaining to bargain upon the terms of employment and to enter into such contract or choose such representatives as they may desire. The act coerces both the employer and the minority of the bargaining unit in negotiating the terms of the contract of employment. It also denies to the majority the right to bargain except through representatives selected as required by the act and as permitted by the Board. To repeat, it is one thing to declare and protect the right to bargain through selected and accredited agents—collective bargaining—and quite another to require collective bargaining; that is, to require that bargains may be made only through such agents and to designate the method and manner of their selection.

It is not an answer to the constitutional question which has arisen in this case to say that the act protects an acknowledged constitutional right—the right to contract—because in doing so the act destroys the very right it purports to protect as to the employers and as to all of the employees by requiring them to act only through agents. The right so denied or destroyed is one guaranteed by the Constitution (Amendment 5) from legislative or governmental interference.

The power of Congress to thus interfere with the right of contract in persons engaged in interstate commerce must be found, if it exists at all, in its power to regulate commerce, and as so necessary an incident thereto as to justify it as a reasonable interference with the private right of contract for the public good. The question then recurs, Is this act a regulation of interstate commerce? The Railway Labor Act of 1926 has been sustained as a regulation of interstate commerce (Texas & N. O. Ry. v. Brotherhood, etc., supra) because that act provided for the voluntary arbitration of labor disputes between employer and employee engaged in interstate commerce. It was held that such a scheme for settlement of disputes had a direct bearing upon interstate commerce. The conclusion seems inescapable, for that act tended directly to prevent strikes by a method or means of settling or forcing a settlement of labor disputes. Nothing more seriously impedes or obstructs interstate commerce than a strike of the persons transporting such commerce. The act herein, if it be deemed also to have the same object of avoiding strikes, steps back a degree further and undertakes to prescribe the manner of entering into employment, and the duties of employer and employee after that contract of employment has been effected, and to prescribe the exclusive method of modifying such contract of employment. It recognizes and declares the right of the employee to strike (section 13 [29 U.S.C.A. § 163]), and thus to coerce the employer. The act thus recognizes the impossibility of constitutionally depriving the worker of that right.

Suspending for a moment the inquiry as to the limitations of Amendment 5 on the right of Congress to enact such legislation, I inquire whether this is so direct a regulation of interstate commerce as to come within the regulatory power of Congress over that commerce. This question in another aspect has recently been considered by the Supreme Court. The action involved the power of Congress to enact the Railroad Retirement Act of 1934 (48 Stat. 1283) 45 U.S.C.A. §§ 201–214. Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 768, 79 L.Ed. 1468, decided May 6, 1935.

The Supreme Court in that case, speaking through Justice Roberts, held that the

pension scheme set up by that act was a violation of the due process of law clause of the Fifth Amendment, and also held that, although the act dealt entirely with the employees in interstate commerce, "the act is not in purpose or effect a regulation of interstate commerce within the meaning of the Constitution. * * * In final analysis," Justice Roberts said, "the petitioners' sole reliance is the thesis that efficiency depends upon morale, and morale in turn upon sureness of security for the worker's old age. Thus pensions are sought to be related to efficiency of transportation, and brought within the commerce power. * * * The question at once presents itself whether the fostering of a contented mind on the part of an employee by legislation of this type is in any just sense a regulation of interstate transportation. If that question be answered in the affirmative, obviously there is no limit to the field of so-called regulation. The catalogue of means and actions which might be imposed upon an employer in any business, tending to the satisfaction and comfort of his employees, seems endless. * * * If contentment of the employee were an object for the attainment of which the regulatory power could be exerted, the courts could not question the wisdom of methods adopted for its advancement. * * * The railway labor act was upheld by this court upon the express ground that to facilitate the amicable settlement of disputes which threatened the service of the necessary agencies of interstate transportation tended to prevent interruptions of service and was therefore within the delegated power of regulation. It was pointed out that the act did not interfere with the normal right of the carrier to select its employees or discharge them."

The Supreme Court stressed the proposition that it was one thing to uphold a scheme for voluntary arbitration and for voluntary pensions and quite a different thing to uphold a law making a system of pensions compulsory. Chief Justice Hughes dissented from this decision and three of the Justices concurred with him. He stated that " * * * provisions have been enacted to facilitate the amicable settlement of disputes and to protect employees in their freedom to organize for the purpose of safeguarding their interests," citing numerous cases, including Texas & N. O. Ry. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed.

1034, supra. Justice Hughes stated: "Laying that question to one side [the effect of excessive superannuation], I think that it is clear that the morale of railroad employees has an important bearing upon the efficiency of the transportation service, and that a reasonable pension plan by its assurance of security is an appropriate means to that end. * * * The argument in relation to voluntary plans discloses the fundamental contention on the question of constitutional authority. In substance, it is that the relation of the carriers and their employees is the subject of contract; that the contract prescribes the work and the compensation; and that a compulsory pension plan is an attempt for social ends to impose upon the relation noncontractual incidents in order to insure to employees protection in their old age. And this is said to lie outside the power of Congress in the government of interstate commerce. Congress may, indeed, it seems to be assumed, compel the elimination of aged employees. A retirement act for that purpose might be passed. But not a pension act. The government's power is conceived to be limited to a requirement that the railroads dismiss their superannuated employees, throwing them out helpless, without any reasonable provision for their protection."

The Chief Justice agreed that some of the requirements of the Railroad Retirement Act were arbitrary and beyond the power of Congress, such as the requirement that the carriers pay retiring allowances to persons who were in the service of the railroad within one year prior to the enactment of the act. On the whole, however, the Chief Justice, and the dissenting Justices, were of the opinion that under the power to regulate commerce Congress had the power to enact compulsory old-age pension laws for such employees as were engaged in interstate commerce. This dissent, while it does not destroy the controlling and binding effect of the decision of the court, does point to the difficulty involved in the attempt of a subordinate court to apply the principles enunciated in the Railroad Retirement Board v. Alton Ry. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468, supra, to an analogous but not identical situation. In the case at bar for instance, it is clear that the National Labor Relations Act was intended to deal with indirect and remote effects upon interstate commerce, such as the decrease in volume of interstate commerce due to the decreased buying power

of the employees whose wages were reduced and the decreased transportation due to the failure to produce raw and manufactured products for transportation. In short, the act as construed by the Labor Relations Board was intended to apply to practically all the industries of the United States whether or not those were directly engaged in interstate commerce or not, and the act on its face indicates and declares this general purpose of upbuilding interstate commerce by increasing purchasing power and increasing production of raw and manufactured products by stabilizing labor conditions. So construed, it is obvious that in the main the application of the act to the regulation of interstate commerce is remote and indirect, but assuming, as I do, that the broad purposes of the act may be narrowed to the field of interstate commerce itself, and made applicable alone to employers and employees actually engaged in interstate transportation, the question remains whether, as so limited and applied, the act is a regulation of interstate commerce and within the legislative power of Congress for that reason. If the question is in doubt, we are bound to resolve that doubt in favor of the constitutionality of the act. Can it be said then that the regulation of the employment of labor upon the transportation systems of the United States engaged in interstate commerce, for the purpose of preventing labor troubles in such transportation, is not a reasonable regulation of interstate commerce? I conclude that the answer is not clear; that the act of Congress so far as it seeks to thus regulate interstate commerce is within the realm of reasonable doubt, and therefore the act must be held by us to be within the delegated power of the federal government to regulate commerce unless the Fifth Amendment so limits the broad power given by the commerce clause of the Constitution so as to prohibit the enforcement of the act in question.

Turning to the question of the Fifth Amendment, as I have already pointed out, the Supreme Court in two decisions, Adair v. United States, and Coppage v. Kansas, supra, dealing with an act which would prohibit an employee from being discharged because of his labor union affiliations, and with legislation which restricted the right of the employer in making contracts of employment which would exclude labor unions, held both violative of the due process clause of the applicable amendments to the Constitution, the Fifth in the first instance, and the Fourteenth in the last. The restrictions in the act under consideration are much more general and far-reaching than the provisions in the acts held invalid in those cases. The employer is not only prohibited by the act in question from refusing to employ or from discharging an employee because of labor union connections, but is required to deal with such unions exclusively, or, rather, with the chosen representatives thereof, in any modification of the original contract of employment. Instead of limiting the employer with relation to that one feature of the contract of employment and to a discharge for the one reason, this act not only prohibits these two things, but also prohibits the employer from even entering into negotiations with any group of its employees other than with the chosen representatives of such unit as is approved by the Labor Relations Board. I cannot see how such an act can escape the condemnation of constitutional invalidity pronounced in the Adair v. United States, and Coppage v. Kansas, cases. In both those cases the question involved interstate commerce. In one (Adair v. United States, supra) it involved the power of Congress over interstate commerce. In both of them the same object sought to be effected in the National Labor Relations Board were involved in a minor degree. The doctrine announced in those cases has not been reversed, impaired, or modified by any subsequent decision of the Supreme Court. Indeed, it is difficult to see how such a fundamental doctrine bottomed upon a consideration of the inherent rights of man could be changed or modified without a violation of the Constitution.

The difficulty facing Congress in dealing with the problem of labor engaged in interstate commerce is fundamental, and arises out of human and inalienable rights of the individuals engaged in that commerce. It is one thing to foster and encourage voluntary settlement of disputes as in the case of the Railway Labor Act of 1926, supra, but quite another to compel the entering into and modification of contracts of employment, and the settlement of disputes as to terms of employment by collective bargaining supervised by governmental agencies, and to make the decision of the governmental agency or Board effective by decree of court which would require, in the case at bar, that the employer be forced to employ individuals re-

gardless of his desire or purpose to do so and upon terms dictated by the Board or by this court.. On the other hand, the employees are forced to conform to the negotiated contract regardless of their wishes in that matter unless they decline employment on any terms. As the act is applied to the employer, we have a fundamental interference with his right or liberty to contract. As applied to the worker, we also have an interference with that right because he cannot enter into a contract without the intervention of agencies he may not choose. His sole remaining right is to refuse to accept the contract negotiated for him by foregoing or abandoning an employment which he may greatly desire on terms he could readily procure but for the inhibitions of the act. I conclude, then, as held by the Supreme Court in Adair v. United States, that by reason of the Fifth Amendment to the Constitution Congress has no power to compel employers and employees engaged in interstate commerce to negotiate their contracts of employment in a specific way and to prohibit the negotiation in any other way.

Thus far we must go in our decision because the act specifically authorizes the Labor Relations Board upon a proper investigation to require the carrier to restore discharged employees and reimburse them for the period of their enforced idleness. That power has been exercised by the Board in the case at bar, and the Board has petitioned this court for a decree enforcing that order. The question involved, then, is one squarely of constitutional power on the part of Congress to require such re-employment and reimbursement through the medium of the Labor Relations Board and the decree of this court. These considerations alone require us to deny the application of the Board for an enforcement order.

In addition, it should be stated that the respondent contends that, inasmuch as the entire act is unconstitutional, the provisions of the act vesting jurisdiction in this court would require a dismissal of the proceeding upon the ground that we have no jurisdiction. It is not necessary to go so far as that in this case, and for that reason we must refuse to do so. I am not prepared to say that there is no portion of the act which is constitutional, and, even if we should hold that the entire act is unconstitutional as the respondent contends, nevertheless the act provides for a review of the decision of the Labor Relations Board and the exercise of judgment on the part of the court in passing upon the order of the Board. This much is certainly within the power of Congress, and therefore justifies and requires the court to consider the case (see section 15 [29 U.S.C.A. § 165] and above discussion thereof), and, if need be, deny the application upon constitutional grounds (see section 15 of the act). What I have heretofore said requires us to refuse the application of the Labor Relations Board for an enforcement order.

The respondent advances several other questions involving the validity of the order in question whether considered from a constitutional standpoint or from the standpoint of the facts involved in this particular proceeding. A consideration of these points involves further statement of the situation upon which the Labor Relations Board acted and upon which we are called to act. This statement will be made as brief as possible.

The employees of the Mackay Radio Corporation struck for the purpose of enforcing certain demands made by the union of its employees with relation to terms of employment. The strike was active for but a few days when the workers recognized that their cause was lost and entered into negotiations with an officer of the company concerning a return to their positions under the former terms of employment. This offer was accepted by the respondent, but it was stated by the officer who attended the meeting of the employees to arrange for the termination of the strike that eleven of the employees whose names were given, including the five employees ordered reinstated by the Board, would have to make application to the company for re-employment, and, inferentially, that such application might be rejected. It is conceded that six of these employees were less competent and less desirable than the main body returning to work and less desirable than the five ordered reinstated by the Board in its order now under consideration. These five employees, although active in advancing the cause of the union and in promoting the strike, were concededly very efficient in the performance of their duties. The employer contends that these five, although remarkably competent operators, were inclined to disregard reasonable rules governing their employment and predicates the discriminatory or-

der against them upon the ground of inattention and insubordination rather than upon their union activities. The Board heard evidence upon this controversy and decided that the real reason for declining to re-employ these individuals was because of their union activities, and, consequently, held that the employer had violated subdivision 3 of section 8 of the act (29 U.S.C.A. § 158(3). Upon this finding the order of restoration and reimbursement was predicated. I have not attempted to distinguish between the five employees ordered restored, although one of them was in New York and did not participate in the strike activities in San Francisco. It was claimed by the employer that he overstayed his leave and this was the basis of discrimination against him. The respondent contends that the five individuals were not employees of the company because by striking they had terminated their employment and ended the relationship between themselves and the respondent; that therefore the Board had no authority even under the terms of the act itself properly construed to consider the rights of these individuals or to order the respondent to employ them or to compensate them for the losses resulting from the strike and refusal to re-employ them. Respondent contends that the provision of the act (section 2, subd. 3, 29 U.S.C.A. § 152 (3), including within the definition of employee one who has ceased work because of a labor dispute and who has not obtained any other regular and substantially equivalent employment, is not effective because Congress cannot by legislative fiat create a relation of master and servant which has been terminated in accordance with law.

I have thus far sufficiently indicated that the controversy adjudicated by the Board was as to whether or not the failure of the company to re-employ the five individuals was predicated upon their union activities. If the decision of the Board is to be sustained against the testimony of the witnesses produced by the company who gave their reasons to the contrary, and in the teeth of the fact that the employer not only re-employed all the labor union men who are on strike, other than these five, and gave as a reason for refusing to re-employ them the fact that it had employed others to take the places they had vacated and had guaranteed to these new employees the privilege of remaining in its employ if and when the strike was settled, provided they desired so to do, it is difficult to conceive of a case in which the decision of the Board would not be final and conclusive upon the court in any case where a labor union employee has been discharged. The Board has predicated its conclusion upon the inference arising from the refusal of the respondent to re-employ these individuals solely from the fact that they were union employees who had been engaged actively in an unsuccessful strike and who desired and were refused re-employment. The difficulty does not end here, because the order of the Board in effect requires the discharge of these men with whom respondent has entered into a binding contract and to whom it has pledged its faith that the settlement of the strike would not interfere with their right to continue in the employment of the company at San Francisco. Can the Board, under the act, require the respondent to breach its contract with these employees who have assisted it in defeating the strike and also compel it to employ individuals who have struck and thus abandoned their work, notwithstanding the choice of the company in preferring the former over the latter? This question, so stated, answers itself. Such a disregard of the right of individuals to enter into and observe contracts that they have made, protected as it is by fundamental constitutional guarantees, cannot be thus interfered with. Adair v. United States, supra; Coppage v. Kansas, supra.

The case might be disposed of on the theory advanced by the respondent that the individuals who were ordered restored to their positions by the Board had themselves, by their voluntary act, ceased to be employees; consequently, that the act does not apply because the act authorized the reinstatement of employees and does not regulate the re-employment or the employment of laborers. Thus interpreted, the act applies only to a situation where the employer has discharged an employee against the will of the employee and his reinstatement is directed in consequence. But to base our conclusion upon that theory in the case at bar would require us to ignore the declarations in the act itself that employees on a strike are to be considered still as employees within the meaning of the act which declares the term "employee" as used in the act to include "any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent

employment." Section 2, subdivision 3 of the act (29 U.S.C.A. § 152 (3). Consequently, the Board was acting well within the power Congress sought to vest in it, and our decision must be based upon the broad ground that the act, according to its plain terms, is unconstitutional as violative of the Fifth Amendment in so far as it attempts to force upon an employer engaged in interstate commerce a contract of employment with those so engaged who have voluntarily terminated contract of employment.

The order requiring the employment of the five individuals named is beyond the power of the Board and cannot be enforced. Enforcement of the portion of the order requiring the employer to post notices that employees will not be discharged because of labor association activities must also be denied. The order enjoining the employer from discharging or threatening any of its employees for the reason that such employees have joined or assisted American Radio Telegraphists' Association, San Francisco Local No. 3, or otherwise engaged in union activity and from in any manner interfering with restraining or coercing its employees in the exercise of their rights to self-organization to form, join, or assist labor organizations to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed by section 7 of the National Labor Relations Act (29 U.S.C.A. § 157), must be refused as an infringement of the due process clause of the Fifth Amendment, and also because no cause for the issuance of the order is shown other than the refusal of the respondent to contract with the five individuals mentioned. I have held this refusal to be within the rights of the respondent, and consequently such refusal should not be made the basis of an injunctive order phrased in the language of the act.

Since the foregoing was written, our attention has been called to a recent decision of the Circuit Court of Appeals for the Second Circuit in a similar proceeding entitled National Labor Relations Board v. The Associated Press, 85 F.(2d) 56, 57. In that matter an editor named Watson was ordered to be tendered employment, or restoration of employment, because the Board, on petition of the American Newspaper Guild, found that Watson had been discharged "because of his membership and activity in the American Newspaper Guild." This allegation was denied by the Associated Press, but was found to be true by the National Labor Relations Board, and the court held in accordance with the express provisions of the National Labor Relations Act that such finding was conclusive on the court. The opinion states that:

"The order issued directed the respondent to cease and desist from discouraging membership in the American Newspaper Guild or in any other organization of its employees by discharging, threatening to discharge, or refusing to reinstate any of its employees for joining the guild or any other labor organization of its employees, and from in any other manner discriminating against any of its employees in regard to hire or tenure of employment or any term or condition of employment for joining the guild or any other labor organization of its employees, and from in any manner interfering with, restraining, or coercing its employees in the exercise of their rights as guaranteed in section 7 of the National Labor Relations Act (29 U.S.C.A. § 157). Notice of compliance with the order was to be posted in the New York office. Respondent was also ordered to offer full reinstatement to Watson and to make up his lost pay. * * *

"In its treatment of Watson, the respondent was found to have engaged in an unfair labor practice, which occurred in the course and current of commerce among the states and with foreign nations, and tended to lead to labor disputes burdening and obstructing commerce and the free flow of commerce. * * *

"The findings of the board as to the facts, if supported by evidence, are made conclusive by section 10 (c), 29 U.S.C.A. § 160(c). See, also, Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 78 L.Ed. 1077; Federal Trade Comm. v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655."

The court sustained the constitutionality of the act as to those engaged in interstate commerce on the authority of Texas & N. O. R. R. Co. v. Brotherhood, etc., 281 U.S. 548, 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034, supra, and the case of Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, cited supra, and

additional cases bearing less directly upon the question. The court concludes:

"This act does not hamper the legitimate right of the employer, who may discharge his employees for inefficiency or any other cause agreeable to him, provided he does not use the power of discharge as a weapon for interfering with the right of employees to organize and bargain collectively. The employer retains full control to bargain with his employees over the wage he shall pay and the working conditions he shall furnish. He remains the master of the operation of his business.

"We think the order entered was validly made by the board and must be enforced."

The respect due to the opinion of a court of co-ordinate jurisdiction requires some further observations along a line which has not been extensively discussed herein; that is, the practical effect of the order. At the threshold of the inquiry we have an employer forced to accept an employee he has discharged for reasons good and sufficient in his judgment. He submitted those reasons to the National Labor Relations Board which held them not to be the true reasons. The court necessarily holds the reasons advanced by the employer to be false, and that the true reason is the labor affiliations and activity of the employee. The employer is ordered to re-employ the discharged employee and also to refrain and desist from discharging this employee or any other for labor organization activities. If the employer now discharges this same employee upon the same grounds that seemed to it to be well founded, is it not clear that it will face a charge of contempt of court for the violation of the order, perhaps preceded by another order of the National Labor Relations Board to restore, and another conclusive finding by it that the order was not based upon the reason given but upon the ground of labor organization relationships? Certainly this is "government by injunction" in a new form. An injunction which prevents an employer from interfering with his own business, instead of an injunction prohibiting one from interfering with another's business. The employer is enjoined from exercising its constitutional right instead of from interfering with another constitutional right, if we accept the decision in Adair v. United States, supra, as authoritative and binding, as we must.

Can we join the Circuit Court of Appeals of the Second Circuit in saying that the employer remains the "Master of the operation of his business," when he has lost the power to control his employees? The employees are cemented into their position, not because of fidelity to their employer, but because of fidelity to a labor organization. It was said long ago that "A man cannot serve two masters, for either he will hate the one and love the other, or else he will hold to the one and despise the other." Matt. 6:27. This principle of human conduct enunciated so long ago has found acceptance in the law of the land, particularly in the law of agency. As Judge Dillon says (1 Dillon, Mun. Corp., 4th Ed., § 444): "It has its foundation in the very constitution of our nature for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well regulated system of jurisprudence prevails." See City of Findlay v. Pertz (C.C.A.) 66 F. 427, 29 L.R.A. 188.

As the Supreme Court said in Michoud et al. v. Girod et al., 4 How. 503, 555, 11 L. Ed. 1076: "The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity." Is it not clear that by the National Labor Relations Act and its practical operation the federal government has assumed control of the business of the employer in one of its most vital features; namely, the tenure of its employees' jobs?

Another matter which is involved in a consideration of the order of the Board in the case at bar has been mentioned but not discussed because of the conclusion as to the invalidity of the act under the Fifth Amendment, is that of the effect of the Seventh Amendment guaranteeing the right to a trial by jury, as to the payment of wages during the period of unemployment. The finding of the Board being made conclusive on the reason for discharge and its adjudication as to the right to such compensation being predicated upon the terms of the act, we have a situation where the right to a jury trial upon the question of right of the employee to recover is denied by the act itself. An action for damages for a wrongful discharge of an employee is a form of action known

to the common law and well within the right to a trial by jury as known at common law. Hence the act, so far as it authorizes the Board to assess damages without the intervention of a jury, is unconstitutional. See discussion of corresponding provisions of the Interstate Commerce Act as first enacted in 1887 (24 Stat. 379), before its amendment in 1889 (25 Stat. 855); Western N. Y. & P. R. Co. v. Penn Refining Co. (C.C.A.) 137 F. 343, 349. See, also, 12 C.J. 131, § 193).

■ The application of the National Labor Relations Board should be denied and, as Judge MATHEWS concurs in this result, is denied.

MATHEWS, Circuit Judge (concurring).

I agree with Judge WILBUR that the National Labor Relations Act (29 U.S.C.A. § 151 et seq.) is not wholly void; that so much of it as vests in the United States Circuit Courts of Appeals jurisdiction to review orders of the National Labor Relations Board is valid; and that we, therefor, have jurisdiction of this proceeding. Whether in other respects the act is valid or invalid, I think it unnecessary to decide. Assuming, without deciding, that in all other respects, the act is valid, the Board's petition should be denied, for the following reasons:

The Board's order is in five parts. The first [paragraph 1(a)] is that respondent shall cease and desist "from discharging or threatening to discharge any of its employees for the reason that such employees have joined or assisted the American Radio Telegraphists' Association, San Francisco Local No. 3, or otherwise engaged in union activities." There is neither allegation nor proof that respondent has discharged or threatened to discharge any of its employees for this or any other reason.* The act does not authorize the Board to order an employer to "cease and desist" from doing that which he is not even accused of.

The second part of the order [paragraph 1 (b)] is that respondent shall cease and desist "from in any manner interfering with, restraining or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choos-

ing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in section 7 of the National Labor Relations Act [29 U.S.C.A. § 157].

There is no evidence that respondent has interfered with, restrained, or coerced any of its employees in the exercise of any of these rights. It is accused of having interfered with, restrained, and coerced A. B. Loudermilk, L. K. Bash, B. D. Phelps, L. N. Rone, and G. E. Palmer in the exercise of such rights, by refusing to re-employ them on October 8 and October 9, 1935, but these men, at that time, were not employees of respondent. They had terminated their employment on October 5, 1935. The Board argues that they should nevertheless be considered employees, in view of the following definition in section 2, subdivision (3), of the act (29 U.S.C.A. § 152 (3) : "The term 'employee' shall include . . . any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment. . . ."

The trouble with this argument is that there is no allegation, no proof, and no finding that Loudermilk, Bash, Phelps, Rone, or Palmer ceased work "as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice." There is evidence that they participated in a strike, but no evidence that the strike was called, or that they participated therein, "as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice." The evidence shows that, at the time of, and for some months prior to, the calling of the strike, certain negotiations were pending between the American Radio Telegraphists' Association and respondent, but it does not show that there was any "current labor dispute," or that respondent had engaged, or was then engaging, in any "unfair labor practice." The strike appears to have been called, not "as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice," but because, as stated by the Board in its findings of fact, the negotiators representing the association "decided that a strike was advisable in view

---

* The original complaint contained such an allegation. The amended complaint does not.

of the unsatisfactory state of the negotiations." Since, on the facts, Loudermilk, Bash, Phelps, Rone, and Palmer do not come within the above-quoted definition, it is unnecessary to consider respondent's contention that section 2, subdivision (3), of the act (29 U.S.C.A. § 152 (3), is unconstitutional and void.

Since these men were not employees at the time they were alleged to have been interfered with, restrained, and coerced, such alleged interference, restraint, and coercion did not constitute an unfair labor practice, within the meaning of the act. Therefore, in ordering respondent to cease and desist from such alleged interference, restraint, and coercion, the Board has exceeded its authority.

The third part of the order [paragraph 2(a)] is that respondent shall offer to Loudermilk, Bash, Phelps, Rone, and Palmer "immediate and full reinstatement, respectively, to their former positions, without prejudice to any rights and privileges previously enjoyed." The fourth part of the order [paragraph 2(b)] is that respondent shall make whole the said Loudermilk, Bash, Phelps, Rone, and Palmer "for any loss of pay they have suffered by reason of their discharge by payment, respectively, of a sum of money equal to that which each would normally have earned as wages during the period from the date of his discharge to the date of such offer of reinstatement, computed at the wage rate stated in the findings of fact as the rate each was paid at the time of his discharge, less the amount earned subsequent to discharge as shown in the findings of fact." These parts of the order are based on the assumption that Loudermilk, Bash, Phelps, Rone, and Palmer were discharged by respondent. The assumption being false, these parts of the order are unwarranted.

The fifth part of the order [paragraph 2(c)] is that respondent shall post, and keep posted for 30 days, in conspicuous places in its various offices, notices stating "that the respondent will not discharge or in any manner discriminate against members of, or those desiring to become members of, the American Telegraphists' Association, or persons assisting said organization or otherwise engaging in union activity." This requires, not merely a statement that respondent will not discharge or discriminate against its employees because of their membership in the association, or

because of their engaging in union activities, but a statement to the effect that it will not, for any cause whatsoever, discharge or discriminate against any member of the association, or any person desiring to become a member thereof, or any person engaging in union activity.

The act does not authorize or purport to authorize the Board to require any employer to make or post any such statement. It does provide that, where any employer is found to have engaged in an unfair labor practice, the Board may require "such affirmative action . . . as will effectuate the policies of this Act [chapter] (29 U.S.C.A. § 160(c)," but to require the posting of such a notice as the Board has prescribed in this case would not and could not "effectuate the policies of this Act [chapter]" or of any legislation which Congress might constitutionally enact. This part of the order is obviously unwarranted.

The petition should be denied.

GARRECHT, Circuit Judge (dissenting).

The increase and magnitude of the conflicts between employers and workers are appalling. In many instances much loss and suffering are precipitated upon those in no sense responsible for these difficulties and at times the general welfare of the country becomes involved in the struggle.

With deference to the very able opinion of the senior judge and of my brother who concurs in the result, I feel that a decision which deprives Congress of the power to establish a department of government clothed with authority to compose the increasing strife between employers and employees, which admittedly adversely affects interstate commerce, is to hamper the general welfare by crippling the government in the exercise of a most beneficial, even necessary, function in the modern field of industrial employment.

The necessity for legislation such as the National Labor Relations Act (49 Stat. 449, 29 U.S.C.A. § 151 et seq.) is becoming increasingly apparent. The enactment of this statute by Congress was not beyond its power under the commerce clause of the Constitution.

The Congress has authority to maintain the orderly conduct of interstate commerce by providing for the peaceful settlement of disputes which threaten it. Texas &

New Orleans R. R. Co. v. Brotherhood of Railway Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

The act (section 10(e), 29 U.S.C.A. § 160(e) provides that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." See National Labor Relations Board v. National New York Packing & Shipping Co. (C.C.A.) 86 F.(2d) 98.

The Board found that the Mackay Radio & Telegraph Company was a corporation engaged in interstate commerce; that it had violated the act, in that it was guilty of unfair labor practices by interfering with the right of its employees to organize and by discrimination with regard to hire and tenure of employment and other conditions so as to discourage membership in labor organizations. There is evidence to sustain the findings.

The evidence is convincing that the five employees were discharged by the company because of their efforts and prominence in the organization work of the union and with the strike against the company.

Four of these employees were classed as operators earning the top salary. Respondent's traffic manager in immediate charge of the San Francisco operators testified that they were among his best operators. A supervisor of the company testified that the other employee discharged was also a first-class operator. At no time during the strike, in the period following it, or before the Board, was the efficiency of these employees questioned.

The evidence further shows that these five operators were all members of the San Francisco Local of the American Radio Telegraphists' Association, and active in organization work. Most of them were members of the grievance or relations committee which had conducted the first negotiations with respect to a proposed general agreement with the Mackay Company relating to wages and conditions of employment. Some were active leaders in the strike and some were on the administrative committee which contacted all the Mackay employees. In fact, the San Francisco Local, by reason of its strength and active leadership, was the dominant unit and the center of A. R. T. A. activity. In eliminating these leaders, the company delivered an effective blow at the whole national organization.

On rather technical grounds it is sought to eliminate the order of the Board which requires that respondent shall cease and desist "from discharging or threatening to discharge any of its employees for the reason that such employees have joined or assisted the American Radio Telegraphists' Association, San Francisco Local No. 3, or otherwise engaged in union activities." It is suggested that, while the original complaint contained the allegation that the respondent was guilty of these acts, the amended complaint does not. However that may be, the answer of respondent filed in this court denied that they were guilty of these charges, and evidence in relation thereto was received at the hearing and no objection on this ground is made by respondent. The act specifically provides that "No objection that has not been urged before the Board, its member, agent or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." After the evidence was taken, the Board moved to have the pleadings conform to the evidence and in that connection filed the amended complaint. It cannot fairly be said that thereby the charge which had been the subject of much evidence and which is denied in the answer and which finds place in the order should be totally disregarded upon this court's own motion.

It is suggested in the concurring opinion that these men were not employees within the meaning of the act and were not discharged, but quit. As pointed out by the main opinion, to reach such a conclusion is to ignore the declaration of the act itself that employees on a strike are to be considered still as employees.

The main opinion, however, by disregarding or discrediting the evidence for the employee operators and by accepting with innocent credulity the explanation for the refusal to re-employ, as given by the agents for the respondent, reached the conclusion that the employees were deprived of their positions for causes entirely independent of any labor difficulties or organization activities; and makes the further statement that to deprive the employer of his inalienable right to hire and fire at will is to violate fundamental constitutional guarantees, particularly the Fifth Amendment. The main opinion holds explicitly "that by reason of the Fifth Amendment to the Con-

stitution Congress has no power to compel employers and employees engaged in interstate commerce to negotiate their contracts of employment in a specific way and to prohibit the negotiation in any other way." As will be pointed out hereafter, even the authorities relied upon in the main opinion do not go to any such extreme.

There is a canon of statutory construction formulated by the courts, often more honored in its breach than in its observance, that no law should be set aside as unconstitutional unless it was clearly so beyond reasonable doubt.

As early as 1811 Chief Justice Tilghman of Pennsylvania in Com. v. Smith, 4 Bin. (Pa.) 117, while asserting the power of the court to hold laws unconstitutional, but declining to exercise it in this particular case, stated the rule as follows:

" * * * for weighty reasons, it has been assumed as a principle in construing constitutions, by the Supreme Court of the United States, by this court, and every other court of reputation in the United States, that an act of the legislature is not to be declared void, unless the violation of the constitution is so manifest as to leave no room for reasonable doubt."

In Dartmouth College v. Woodward, 4 Wheat. 518, at page 625, 4 L.Ed. 629, Mr. Chief Justice Marshall took occasion to state: "On more than one occasion, this court has expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared, that in no doubtful case, would it pronounce a legislative act to be contrary to the constitution."

Again, in Ogden v. Saunders, 12 Wheat. 213, 270, 6 L.Ed. 606, it was said: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone, would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt."

Also, in Adkins v. Children's Hospital, 261 U.S. 525, 544, 43 S.Ct. 394, 396, 67 L.Ed. 785, 24 A.L.R. 1238, the Supreme Court stated: "The judicial duty of passing upon the constitutionality of an act of Congress is one of great gravity and delicacy. The statute here in question has successfully borne the scrutiny of the legislative branch of the government, which, by enacting it, has affirmed its validity, and that determination must be given great weight. This court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt."

The act here in question has been before many District Courts that have held it to be constitutional. Their decisions are not binding upon this court, still many of the judges rank high for their ability, and the well-argued presentations of their views are worthy of respect and have served to strengthen my own opinion that it cannot be said that there exists between the Constitution and this law and beyond all reasonable doubt a clear and unmistakable conflict. Moreover, other Circuit Courts of Appeals of equal standing and authority with this court likewise have sustained the constitutionality of the acts of the Board under the act. National Labor Relations Board v. The Associated Press, 85 F.(2d) 56 (C.C.A. 2); National Labor Relations Board v. Washington, Virginia and Maryland Coach Co., 85 F.(2d) 990 (C.C.A. 4); Bradley Lumber Co. v. National Labor Relations Board, 84 F.(2d) 97 (C.C.A. 5).

In giving consideration to these decisions, which harmonize with my own views, I feel that I cannot hold that the action of the Board in the case at bar was unconstitutional, or that the order prayed for should not be granted.

The main opinion holds that the action of the National Labor Relations Board violates the Fifth Amendment to the Constitution. This conclusion is rested on the authority of Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A. 1915C, 960. In both of these cases, as the main opinion suggests, the question before us was involved only in a minor degree. The Adair Case relies upon the decision of the court in Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133.

As this latter case is made the basis for the decisions relied upon in the main opinion, the fact should not be lost sight of that there a state statute purporting to be a health regulation passed by virtue of the police power was involved. The National Labor Relations Act, on the other hand, was passed as a regulatory measure applicable to interstate commerce, a field of legislation over which Congress has been given jurisdiction by the Constitution. The federal power to regulate instrumentalities of interstate communication such as telegraph companies or radio broadcasting stations has been upheld. Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U.S. 1, 9, 10, 24 L.Ed. 708; Federal Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 279, 53 S.Ct. 627, 633, 77 L.Ed. 1166, 89 A.L.R. 406; Fisher's Blend Station v. Tax Comm., 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956.

That the court in the Adair Case did not intend to give that decision the wide sweep that is taken in the main opinion here is clear from the restricted language used. There it was said (208 U.S. 161, at page 180, 28 S.Ct. 277, 283, 52 L.Ed. 436, 13 Ann.Cas. 764): "It results, on the whole case, that the provision of the statute under which the defendant was convicted must be held to be repugnant to the 5th Amendment, and as not embraced by nor within the power of Congress to regulate interstate commerce, but under the guise of regulating interstate commerce, and as applied to this case, it arbitrarily sanctions an illegal invasion of the personal liberty as well as the right of property of the defendant Adair."

This limitation was also stressed in the dissenting opinion (208 U.S. 161, at page 181, 28 S.Ct. 277, 283, 52 L.Ed. 436, 13 Ann.Cas. 764): "The principle upon which the opinion is grounded is, as I understand it, that a labor organization has no legal or logical connection with interstate commerce, and that the fitness of an employee has no dependence or relation with his membership in such organization. It is hence concluded that to restrain his discharge merely on account of such membership is an invasion of the liberty of the carrier guaranteed by the 5th Amendment of the Constitution of the United States. The conclusion is irresistible if the propositions from which it is deduced may be viewed as abstractly as the opinion views them. May they be so viewed?"

Indeed, the decision in the Adair Case itself indicates that circumstances such as confront us here, where interstate commerce is involved and the rights of the general public prejudiced, might justify a different holding. This is easily discerned in the quotations given in the main opinion. Speaking of a section of the act of Congress there under consideration, the following was said (208 U.S. 161, at page 172, 28 S.Ct. 277, 279, 52 L.Ed. 436, 13 Ann. Cas. 764): "The first inquiry is whether the part of the 10th section of the act of 1898 upon which the first count of the indictment was based is repugnant to the 5th Amendment of the Constitution, declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that Amendment. Such liberty and right embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor; *each right, however, being subject to the fundamental condition that no contract, whatever its subject-matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests, or as hurtful to the public order, or as detrimental to the common good.*"

We have italicized the portion to which we direct attention as sustaining our view. We quote further from the main opinion (208 U.S. 161, at page 173, 28 S.Ct. 277, 280, 52 L.Ed. 436, 13 Ann.Cas. 764): "'The general right to make a contract in relation to his business is part of the liberty of the individual protected by the 14th Amendment of the Federal Constitution. Allgeyer v. Louisiana, 165 U.S. 578, 17 S. Ct. 427, 41 L.Ed. 832. Under that provision no state can deprive any person of life, liberty, or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this Amendment, *unless there are circumstances which exclude the right.*'"

Here, again, we have italicized a modifying clause which would distinguish the cases relied upon from the case at bar.

To confine this opinion to reasonable limitations prevents reviewing the many

636

cases in which employment relations have been subjected to regulations and where parties have invoked the due process clauses of the Fifth and Fourteenth Amendments without success. A few may be mentioned to indicate the wide field covered by these decisions. Among those dealing with statutes prescribing the character, method, and time of payment of wages may be included: McLean v. Arkansas, 211 U. S. 539, 29 S.Ct. 206, 53 L.Ed. 315; Knoxville Iron Co. v. Harbison, 183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55; Keokee Consolidated Coke Co. v. Taylor, 234 U.S. 224, 34 S.Ct. 856, 58 L.Ed. 1288; Erie R. R. Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A.(N.S.) 1097; Statutes fixing hours of labor; Holden v. Hardy, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780; Bunting v. Oregon, 243 U.S. 426, 37 S.Ct. 435, 61 L.Ed. 830, Ann.Cas.1918A, 1043.

The employment activities of the workers here involved concededly were in the field of interstate commerce which makes the act even more applicable.

The power of Congress to regulate commerce is paramount and is unrestrained, except by limitations in the Constitution upon its authority. The only limitation presented by the Constitution is that the laws enacted shall be necessary and proper, which question generally is exclusively within the province of Congress to determine.

The full extent of the burden of these industrial disputes is not always realized, but upon occasion the interruption is so acute and of such consequence to the country as to engage the attention of members of the Cabinet and even the President himself.

Investigation of the causes of most of these industrial disturbances show that controversies as to wages, hours of work, or matters of working conditions and the insistence of employees of the right to organize for self-protection have brought about most of these conflicts. With the development of modern industry the necessity for such organization has become more apparent and the right of the workers to participate in such activities has been recognized.

As Mr. Chief Justice Taft said in American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360: "They [labor unions] were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court."

The National Labor Relations Act was enacted to relieve the burdens or obstructions placed on interstate commerce under similar circumstances and conditions. In Chicago, B. & Quincy R. R. Co. v. McGuire, 219 U.S. 549, at pages 566–568, 31 S.Ct. 259, 262, 55 L.Ed. 328, in an opinion by Mr. Justice Hughes, it is said:

"It has been held that the right to make contracts is embraced in the conception of liberty as guaranteed by the Constitution. Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133; Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764. In Allgeyer v. Louisiana, supra, the court, in referring to the 14th Amendment, said [165 U.S. 578, at page 589, 17 S.Ct. 427, 41 L.Ed. 832]: 'The liberty mentioned in that Amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.' But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty

of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. Crowley v. Christensen, 137 U.S. [86] 89, 11 S.Ct. 13, 34 L.Ed. [620] 621; Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765. 'It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence; and, indeed, may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property.' Frisbie v. United States, 157 U.S. [160] 165, 166, 15 S.Ct. 586, 39 L.Ed. [657] 658, 659.

"The right to make contracts is subject to the exercise of the powers granted to Congress for the suitable conduct of matters of national concern; as, for example, the regulation of commerce with foreign nations and among the several states. Addyston Pipe & Steel Co. v. United States, 175 U.S. [211] 228-231, 20 S.Ct. 96, 44 L.Ed. [136] 142-144; Patterson v. The Eudora, 190 U.S. [169] 174-176, 23 S.Ct. 821, 47 L.Ed. 1002, 1006, 1007; Atlantic Coast Line Co. v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 [31 L.R.A.(N.S.) 7]; Louisville & Nashville R. R. Co. v. Mottley (decided this day) 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 [34 L.R.A.(N.S.) 671]."

In the case of Atlantic Coast Line Railroad Company v. Riverside Mills, 219 U.S. 186, 201-203, 31 S.Ct. 164, 168, 55 L.Ed. 167, 31 L.R.A.(N.S.) 7, the court there said:

"It must be conceded that the effect of the act in respect of carriers receiving packages in one state for a point in another, and beyond its own lines, is to deny to such an initial carrier the former right to make a contract limiting liability to its own line. This, it is said, is a denial of the liberty of contract secured by the 5th Amendment to the Constitution. To support this, counsel cited such cases as Allgeyer v. Louisiana, 165 U.S. [578] 589, 17 S.Ct. 427, 41 L.Ed. [832] 835; Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133; and Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764.

"This power to regulate is the right to prescribe the rules under which such commerce may be conducted. 'It is,' said Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 1, 197, 6 L.Ed. 23, 70, 'the power * * * vested in Congress as absolutely as it would be in a single government having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States.' It is a power which extends to the regulation of the appliances and machinery and agencies by which such commerce is conducted. * * * In the Employers' Liability Cases (Howard v. Illinois Cent. R. Co.), 207 U.S. 463, 495, 28 S.Ct. 141, 52 L.Ed. 297, power to pass an act which regulated the relation of master and servant, so as to impose on the carrier, while engaged in interstate commerce, liability for the negligence of a fellow servant, for which at common law there was no liability, and depriving such carrier of the common-law defense of contributory negligence save by way of reduction of damages, was upheld. In Addyston Pipe Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, and Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, it was held that this power of regulation extended to and embraced contracts in restraint of trade between the states.

"It is obvious, from the many decisions of this court, that there is no such thing as absolute freedom of contract. Contracts which contravene public policy cannot be lawfully made at all; and the power to make contracts may in all cases be regulated as to form, evidence, and validity as to third persons. The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests. Undoubtedly the United States is a government of limited and delegated

powers, but in respect of those powers which have been expressly delegated, the power to regulate commerce between the states being one of them, the power is absolute, except as limited by other provisions of the Constitution itself.

"Having the express power to make rules for the conduct of commerce among the states, the range of congressional discretion as to the regulation best adapted to remedy a practice found inefficient or hurtful is a wide one. If the regulating act be one directly applicable to such commerce, not obnoxious to any other provision of the Constitution, and reasonably adapted to the purpose by reason of legitimate relation between such commerce and the rule provided, the question of power is foreclosed. 'The test of power,' said Mr. Justice White, speaking for this court in the Employers' Liability Cases, cited above, 'is not merely the matter regulated, but whether the regulation is directly one of interstate commerce, or is embraced within the grant * * * conferred on Congress to use all lawful means necessary and appropriate to the execution of the power to regulate commerce.' "

In the recent case of Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, Mr. Justice Roberts thus summarized the principles involved: "The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases." 291 U.S. 502, at pages 527, 528, 54 S.Ct. 505, 512, 78 L.Ed. 940, 89 A.L.R. 1469. "Neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm." 291 U.S. 502, at page 523, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469. "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power. * * * And the Guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." 291 U.S. 502, at page 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469.

It is urged, and supported with considerable force of reason that the Adair, Coppage, and Lochner Cases, which were decided by a divided court, in so far as they may be applicable to the case at bar, have been modified or overruled by the later case of Texas & New Orleans R. R. Co. v. Brotherhood of Railway Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, which was decided in 1930 by a unanimous court. From a careful reading and a comparison of all of these opinions this conclusion seems well founded.

The case of Texas & New Orleans R. R. Co. v. Brotherhood of Railway Clerks, supra, is in many particulars strikingly similar to the case at bar. In asserting the same principle with respect to the constitutional issue, the court, speaking through Mr. Chief Justice Hughes, there said (281 U.S. 548, at page 570, 50 S.Ct. 427, 434, 74 L.Ed. 1034): "It has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work. American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360. Congress was not required to ignore this right of the employees but could safeguard it and seek to make their appropriate collective action an instrument of peace rather than of strife."

It was there urged that the cases of Adair and Coppage were controlling, but in disposing of that argument the court said (281 U.S. 548, at pages 570, 571, 50 S.Ct. 427, 434, 74 L.Ed. 1034): "The petitioners invoke the principle declared in Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764, and Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960, but these decisions are inapplicable. The Railway Labor Act of 1926 does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them."

So in this case the act does not interfere with the normal right of an employer, but is designed to prevent him from interfering with the rights of the employees to organize themselves into effective unions and to be members thereof.

We are concerned here only with the right of the employee, as stated in the act,

"to self-organization, to form, join, or assist labor organizations * * * and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection" (29 U.S.C.A. § 157), and without the discrimination of the employer "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization" (29 U.S.C.A. § 158 (3), rights which are guaranteed by the act. As we have seen, protection of these rights is not a new or unusual principle, but one which has been developed by statute and decision over a long period of years.

Furthermore, it was the purpose of the act, as already stated, to relieve interstate and foreign commerce from the burdens caused by labor disputes. We quote from section 1 (29 U.S.C.A. § 151): "Experience has proved that protection by law of the right of employees to organize and bargain collectively safe-guards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees."

It is appropriate ·here to quote again the language of Mr. Chief Justice Hughes in Texas & New Orleans R. R. Co. v. Brotherhood of Railway Clerks, supra, 281 U.S. 548, at page 570, 50 S.Ct. 427, 433, 74 L.Ed. 1034: "We entertain no doubt of the constitutional authority of Congress to enact the prohibition. The power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 696, 697, 26 L.Ed. 238); to 'foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A.(N.S.) 44). Exercising this authority, Congress may facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation. In shaping its legislation to this end, Congress was entitled to take cognizance of actual conditions and to address itself to practicable measures."

In its effort to distinguish the Texas & N. O. R. R. Co. Case, supra, from the present suit, the main opinion seems somewhat inconsistent. The opinion points out that in the railroad case "it was held that the statute gave a right to the employees upon which they could seek the intervention of the court to enjoin the Railroad Company from an interference with that right." In that case the Supreme Court held (281 U.S. 548, at page 560, 50 S.Ct. 427, 430, 74 L.Ed. 1034), that the discharge from the service of the Railroad Company of leading representatives of the Brotherhood helped to give "support, despite the attempted justification of these proceedings, to the conclusion of the courts below that the railroad company and its officers were actually engaged in promoting the organization of the association in the interest of the company and in opposition to the brotherhood, and that these activities constituted an actual interference with the liberty of the clerical employees in the selection of their representatives."

In another portion of the main opinion in this case, it is conceded that, "as the right to bargain collectively is a well-recognized right, Congress can protect that right."

In other words, the main opinion concedes the power of Congress to protect employees from coercion—by means of dismissal or refusal to re-employ—in connection with the employees' right to select their own agents to represent them in negotiating an arbitration agreement. But the main opinion denies the power of Congress to protect employees from coercion—likewise by means of dismissal or refusal to re-employ—in connection with another conceded right of the employees; namely, that of collective bargaining.

The parallelism between these two types of labor rights is, in my opinion, inescapable. Each should be equally within the protection of congressional action against coercion by the employers, in the form of dismissal or, as here, cutting off the employees by reason of difficulties arising out of the strike, particularly sought to be avoided by the act.

The main opinion argues for absolute liberty to contract, but the irony of the situation is that under existing economic

conditions such freedom as between master and worker is mostly mythical. The only liberty interfered with is the liberty of the strong to oppress the weak.

The main opinion contends that any limitation on the freedom of contract between employee and employer is obnoxious to the constitution. However, legislatures have frequently passed such statutes which courts have upheld upon the theory, as stated by Mr. Chief Justice Taft (Adkins v. Children's Hospital, 261 U.S. 525, 562, 43 S.Ct. 394, 403, 67 L.Ed. 785, 24 A.L.R. 1238, that the lawmaking body might proceed on the assumption that employees, in some circumstances, "are not upon a full level of equality of choice with their employer and in their necessitous circumstances are prone to accept pretty much anything that is offered. They are peculiarly subject to the overreaching of the harsh and greedy employer." Indeed, as pointed out by Mr. Justice Holmes (261 U.S. 525, at page 571, 43 S.Ct. 394, 406, 67 L.Ed. 785, 24 A.L.R. 1238), it has been asserted by a noted authority that it is the doctrine of modern economists of all schools that "freedom of contract is a misnomer as applied to a contract between an employer and an ordinary individual employee."

Economic domination must be kept within definitely just limits, and, where necessary, government, where possible, should exercise effective control and, where the evil embraces the field of interstate commerce, the right so to do within the Constitution cannot be questioned.

To avoid the force and effect of the decisions which sustain the power of Congress in labor matters where the effect on interstate commerce is direct, the main opinion has sought to narrow the purpose of the National Labor Relations Act in an unwarranted degree. Says the opinion: "In the case at bar, for instance, it is clear that the National Labor Relations Act was intended to deal with indirect and remote effects upon interstate commerce, such as the decrease in volume of interstate commerce due to the decreased buying power of the employees whose wages were reduced and the decreased transportation due to the failure to produce raw and manufactured products for transportation."

A reading of the act itself shows how erroneous is this restricted view. Says the act: "Section 1. The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce." 29 U.S.C.A. § 151.

To verify the existence of the evils enumerated which are sought to be eliminated, we need only to take judicial notice of what is going on all about us. In these struggles and conflicts between employers and workers, the loss and suffering entailed thereby perhaps fall most heavily upon the innocent public. Regulation which will minimize these evils is a necessity.

In the main opinion the rights of the master are exaggerated and distorted; while the equal rights of the employee are waived aside or overlooked, and, more significantly still, the rights of the public in a controversy such as this are ignored and utterly disregarded. Labor troubles involving the Mackay Radio & Telegraph Company, like those involving ships, railroads, and other public service ownerships which impair the efficiency of the service, cannot but affect the general public. The employers may own the wires, ships, and rails, but the public has a right to have them operate efficiently for the general welfare, and the Congress has a duty to maintain this right by proper legislation and prevent unfair or capricious interference with or obstruction of the usual flow of this commerce.

So, here, the National Labor Relations Act "does not interfere with the normal exercise of the right" of the employer to hire or discharge his employees for incompetency, dishonesty, neglect of duty, or for any ordinary cause, but is aimed to protect employees in their rights as set forth in the act.

The main opinion also sustains the contention of respondent that the order of the Board requiring it to pay to the wrongfully discharged employees an amount equal to what they would have earned had they not been discharged is a violation of the Seventh Amendment which guarantees the right of trial by jury. This is a proceeding in equity, and the primary relief sought is the reinstatement of the discharged employees and the award for wages at the regular rate of salary for the time out by reason of the wrongful discharge is an incident to the equitable relief granted. The Supreme Court said in Shields v. Thomas, 18 How.(59 U.S.) 253, 261, 262, 15 L.Ed. 368: "We can perceive no force in the effort to sustain this objection by citation of the 7th amendment of the Constitution of the United States, which provides 'that in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.' This provision, correctly interpreted, cannot be made to embrace the established, exclusive jurisdiction of courts of equity, nor that which they have exercised as concurrent with courts of law; but should be understood as limited to rights and remedies peculiarly legal in their nature, and such as it was proper to assert in courts of law, and by the appropriate modes and proceedings of courts of law."

In Texas & N. O. R. R. Co. v. Brotherhood of Railway Clerks an order under the Railway Labor Act of 1926, requiring reinstatement, with back pay, of three workers discriminatorily discharged "in violation of the law and of the injunction" (25 F.(2d) 876, at page 878), was held not to have gone "beyond the proper enforcement" of the act (281 U.S. 548, at page 571, 50 S.Ct. 427, 434, 74 L.Ed. 1034).

The contention made, based upon the violation of the Seventh Amendment, has been admirably answered in the case of Agwilines, Inc., v. National Labor Relations Board, 87 F.(2d) 146, decided by the Circuit Court of Appeals for the Fifth Circuit on December 22, 1936, and which became available for study only after the preceding paragraphs had been written. Indeed, it would have been sufficient to have rested this dissent on the decision in that case, the facts of which were similar to the one at bar.

The petition should be granted.